**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **TRAMAINE CHRISTOPHER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 15-00399-CV-W-GAF** |
| | ) | |
| **JACK COOPER TRANSPORT COMPANY,** | ) | |
| **INC. and LUC STOWERS,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER

Presently before the Court are Defendants Jack Cooper Transp. Co. Inc.'s ("JCT") and Lucian "Luc" Stowers's ("Stowers") (collectively "Defendants"), and Plaintiff Tramaine Christopher's ("Christopher" or "Plaintiff") cross-Motions for Summary Judgment. (Docs. ## 92, 94). Defendants request the Court enter summary judgment in their favor on all of Plaintiff's claims. (Doc. # 92). Plaintiff requests the Court enter summary judgment in her favor on Count II, wrongful withholding of wages, and partial summary judgment on Count I, wrongful discharge, and Count III, gender-based discrimination.[1] (Doc. # 94). Defendants and Plaintiff each oppose the other motion. (Doc. ## 101, 102). For the reasons stated below, Defendants' motion is GRANTED and Plaintiff's motion is DENIED.

## DISCUSSION

### I.     BACKGROUND

JCT is a vehicle logistics and transport company that operated as the primary auto carrier

---

[1] Plaintiff additionally begs the Court to seriously scrutinize Defendants' arguments under Fed. R. Civ. P. 11 and Model Rules of Prof'l Conduct R. 3.3. (Doc. # 102, p. 7 n. 124; p. 8 n. 129). The Court denies Plaintiff's request.

for new Ford F-150s assembled at Ford's Claycomo, Missouri facility. (Deposition of John Ditta ("Ditta Dep."), 8:4-13; 11:4-14). JCT began operating the Claycomo facility on January 1, 2014 and ceased operations on May 3, 2015. (Deposition of Lucian Stowers ("Stowers Dep."), 76:1-4; 79:3-10). JCT employees received new F-150s from the Ford plant and drove the trucks to designated areas for further shipping. (Ditta Dep., 10:14-11:3). After the employees parked the new F-150 in the designated area, the employees rode in a shuttle van back to the pad and repeat the process. (Deposition of Tramaine Christopher ("Christopher Dep."), 33:23-34:10). JCT employees drove new F-150s to one of two designated areas–the "City Yard" or the "Wade Yard." (Ditta Dep. 13:4-17). The City Yard was adjacent to the Ford plant. (*Id.* at 13:7-12). A street separated the Wade Yard from the City Yard and the Ford plant.

(*Id.* at 13:13-15). JCT "yard employees" were a unionized workforce, affiliated with the International Brotherhood of Teamsters and operated under the National Master Automobile Transporters Agreement and the Central and Southern Areas Supplemental Agreement (collectively the "Collective Bargaining Agreement" or "CBA"). (Declaration of Lucian Stowers ("Dec. Stowers"), ¶ 7). Lucian "Luc" Stowers worked for JCT as a Yard Superintendent at the Claycomo facility in 2014. (*Id.* at 5:17-6:12). As Yard Superintendent, Stowers directed all supervisors and was responsible for the overall yard operations. (Stowers Dep., 6:23-7:4). Stowers reported to the Terminal Manager, John Ditta. (Stowers Dep., 32:6-12; Ditta Dep. 19:4-8). Ditta was the Terminal Manager from the date JCT assumed operational control at the Claycomo facility, until his June 31, 2015 retirement. (Ditta Dep., 7:4-12, 19-21). As Terminal Manager, Ditta was the highest ranking employee at the Claycomo facility. (Ditta Dep., 8:18-9:1).

Plaintiff began working for JCT in January 2014 as a car hauler. (Christopher Dep., 27:9-16; 27:24-28:6; 33:18-22; 37:13-15). Car haulers are also known as yard employees. (*Id.* at 27:13-16). Prior to Plaintiff's employment with JCT, she had been employed at the same Claycomo plant by Allied, the prior yard-operating company. (Christopher Dep., 25:15-18). JCT's and Allied's operations were similar, and JCT retained Allied's yard employees and unionized workforce. (Ditta Dep., 16:7-25). Plaintiff performed the same work for both Allied and JCT. (Christopher Dep., 27:9-12). Plaintiff was a member of the Local 41 Union and the Teamsters. (*Id.* at 26:22-27:8).

Plaintiff received weekly paychecks throughout her employment with JCT. (*Id.* at 142:24-143:1). Plaintiff's paychecks were dated for the Friday of each workweek. (*Id.* at 271:21-272:15). Plaintiff received her paychecks each Thursday, except for two instances when she received her paycheck on Friday. (*Id.* at 273:3-9). The CBA states "[e]mployees' payday shall be no later than the ending of the last weekly, bi-weekly or bi-monthly pay period, except in cases beyond the Employer's control." (Dec. Stowers, ¶ 8; CBA, p. 153). Both instances when she received her paycheck on Friday occurred in February 2014. (Christopher Dep., 141:4-142:23). Plaintiff told "management inside of the office, Matt Fisher," a non-union employee, about the timing of the two Friday paychecks after each instance. (*Id.* at 148:21-149:9). Fisher was Stowers' superior. (*Id.* at 301:11-14). Plaintiff does not recall signing a grievance form concerning her paychecks. (*Id.* at 296:8-297:8). After the first late paycheck, Stowers informed Plaintiff that the reason the paychecks were given out on Fridays instead of Thursdays was "because certain employees or different people didn't show up for their shift – after they received their checks on Thursday, they didn't show up at work on Fridays. So he would start passing out checks on Friday from here on out." (*Id.* at 151:15-152:10). After the

second Friday paycheck, Fisher instructed Stowers to resume allowing employees to pick up paychecks on Thursday. (*Id.* at 302:12-19).

While Ditta was Terminal Manager, Ditta modified the break policy to require employees to inform their supervisor if they were going to cross the street to use the restroom. (Ditta Dep., 56:19-57:16). Across the street, the Wade Yard had restrooms with running water, whereas the City Yard had portable restrooms outside as well as restrooms with running water inside the main office. (*Id.* at 14:24-15:7; Christopher Dep., 35:17-36:12). The policy required yard employees to communicate about their restroom use over a radio system. (Ditta Dep., 57:4-11). The broadcast aired on personal portable radios carried by supervisors and yard employees, as well as on shuttle vans used to transport employees. (Doc. # 102, p. xxi, ¶ 64; Doc. # 103, p. 27. ¶ 64). Previously, employees were able to use the restroom without communicating with a supervisor. (Ditta Dep., 61:15-24). Plaintiff and Defendant disagree as to whether the policy required employees to ask for permission from the supervisor to use the restroom, or simply notify the supervisor. (Doc. # 102, pp. xxi-xxii, ¶ 65; Doc. # 103, p. 27, ¶ 65). The break policy applied to all yard employees, regardless of race. (*Id.* at 63:11-64:1). The purpose of the policy was to ensure enough employees were available on the jobsite at all times. (*Id.* at 62:18-63:15). JCT placed no limit on the number of times an employee could use the restroom. (*Id.* at 63:11-15).

Additionally, Plaintiff was pregnant for a period of time while working for JCT. (Christopher Dep., 121:24-122:21). Plaintiff first learned she had been pregnant in May 2014 after she experienced a miscarriage and was no longer pregnant. (*Id.* at 122:14-23). JCT and Stowers were unaware of Plaintiff's pregnancy while Plaintiff was pregnant. (*Id.*; Doc. # 93, p. 5, ¶ 18; Doc. # 102, p. vi, ¶ 18).

On June 29, 2014, Plaintiff was driving a new F-150 to a parking spot in the Claycomo terminal. (Christopher Dep., 51:1-16). While driving the vehicle, Plaintiff was involved in an accident. (*Id.* at 51:6-58:17). Due to the accident, a transport truck driving employee of another company, Cassens, required medical treatment at a local emergency room. (Ditta Dep., 39:16-40:17). Per the CBA, JCT issued Plaintiff a 40-day letter of investigation. (*Id.* at 29:9-11). The letter stated that JCT might take disciplinary action against Plaintiff, pending an investigation that could take up to forty days to complete. (*Id.* at 29:9-13).

Michael McGinnis, who reported to Ditta, oversaw the investigation of Plaintiff's accident. (*Id.* at 28:15-16). Ditta was ultimately responsible for whether to pursue discipline against Plaintiff. (37:19-22). Plaintiff participated in the investigation and a reenactment of the accident. (*Id.* at 31:9-19). After the completing the investigation, Ditta determined that Plaintiff's recklessness resulted in a serious accident and determined Plaintiff should be discharged. (*Id.* at 37:23-38:7). JCT considered the accident a "major chargeable offense" under the CBA. (Stowers Dep., 158:11-21; CBA, p. 124-25). The CBA does not further define "major chargeable offense." (CBA, p. 124-25). However, the CBA states that "no warning notice need be given to an employee before he is discharged if the cause of such discharge is dishonesty or drunkenness or recklessness resulting in serious accident while on duty . . . ." (*Id.* at 124). JCT had not disciplined Plaintiff prior to this accident. (Doc. # 102-23). Per the CBA, JCT held a "prehearing"[2] attended by Plaintiff, JCT employees, and local union representatives. (Ditta Dep., 42:16-43:8). The purpose of the prehearing is to allow the parties to present facts and

---

[2] Ditta describes the prehearing as a process under the CBA where the supervisor, local union representatives, the employee, and the company director of labor meet to discuss the facts of an incident. (Ditta Dep., 42:21-43:8). Both the employee and the supervisor are allowed to present at the prehearing. (*Id.* at 43:1-3). After both sides present, the prehearing committee determines whether to take no action, discharge the employee, or suspend the employee. (*Id.* at 3-5).

determine whether to discharge the employee. (*Id.*). The prehearing committee determined to discharge Plaintiff and communicated the decision to her after the meeting. (*Id.*).

Plaintiff then filed a grievance through the union. (*Id.* at 46:16-47:5). Per the CBA, a national joint arbitration committee of union and non-union members ("Committee") heard Plaintiff's grievance. (*Id.* at 48:7-49:2). The Committee upheld the decision to discharge Plaintiff. (*Id.* at 49:3-8).

JCT terminated Plaintiff on August 4, 2014. (Christopher Dep., 113:23-114:4). JCT did not offer Plaintiff retraining in lieu of termination. (Doc. # 102, p. xx; Doc. # 103, p. 24). Plaintiff filed a complaint with the Equal Employment Opportunity Commission and received her right-to-sue letter on May 18, 2015. (Doc. # 43, ¶ 27).

Ditta had no knowledge of any complaints of discrimination by Plaintiff during Ditta's tenure as Terminal Manager. (Ditta Dep., 26:11-20). After JCT terminated Plaintiff's employment, the next four employees hired as yard employees were the following: Erick Iverson (African American male); Kyle Lee (Caucasian male); Kimberly Stecker (Caucasian female); and Angela Vassmer (Caucasian female). (Stowers Dep., 173:13-174:15; Dec. Stowers, ¶ 18).

## II.   LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate if the evidence, viewed in the light most favorable to the [nonmovant] and giving [the nonmovant] the benefit of all reasonable inferences, shows there are no genuine issues of material fact and [the movant] is entitled to judgment as a matter of law." *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011). "Once the moving party has made and supported their motion, the nonmoving party must

proffer admissible evidence demonstrating a genuine dispute as to a material fact." *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011). Essentially, a party resisting a motion for summary judgment must support their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles Cty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (first alteration in original) (quoting *Gregory v. Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid a summary judgment." Summary judgment should not be granted if a reasonable jury could find for the nonmoving party. *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.     ANALYSIS

### A.     FLSA Claims

#### a.  Wrongful Discharge

Plaintiff claims she was wrongfully discharged, in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (the "FLSA"). (Doc. # 43, p. 5-7). She claims that Defendants terminated her employment in retaliation for her complaints regarding late paychecks. (*Id.*).

"The FLSA makes it unlawful 'to discharge or in any other manner discriminate against any employee because such employee has filed any complaint . . . under or related to this chapter." *Grey v. Oak Grove, Mo.*, 396 F.3d 1031, 1034 (8th Cir. 2005) (ellipses in original) (quoting 29 U.S.C. § 215(a)(3)). "Retaliation claims under the . . . FLSA may be proven either by direct evidence or, in the absence of such evidence, under the familiar *McDonnell-Douglas* burden-shifting framework." *Wood v. SatCom Mktg., LLC*, 705 F.3d 823, 828 (8th Cir. 2013). "Direct evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder than an

illegitimate criterion actually motivated the adverse employment action." *Id.* (quotation and alteration omitted). Plaintiff presents no such direct evidence of retaliation; therefore *McDonnell-Douglas* applies. *See id.*

Under *McDonnell-Douglas*:

> [Plaintiff] must establish a prima facie claim of retaliation to survive summary judgment by providing evidence from which a jury could conclude that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between her protected activity and the adverse employment action. *Id.* But if [Defendants] come[] forward with evidence of a legitimate, nonretaliatory basis for the adverse employment action, she must then point to some evidence that [Defendants'] asserted basis is pretextual.

*Fezard v. United Cerebral Palsy of Cent. Ark.*, 809 F.3d 1006, 1012 (8th Cir. 2016).

Defendants admit Plaintiff suffered an adverse employment action. (Doc. # 101, p. 19). Further, Plaintiff may have engaged in a statutorily protected activity when she orally complained to her supervisor about receiving her paycheck on a Friday instead of a Thursday. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011) (stating oral complaint can be "filed" for the purpose of the FLSA when "a reasonable, objective person would have understood the employee to have put the employer on notice that the employee is asserting statutory rights under the Act" (internal citations and modifications omitted)).

However, Plaintiff fails to demonstrate a causal connection between her paycheck complaint and her termination. Plaintiff argues that her firing took place some time after she complained to her supervisor. (*See* Doc. # 95, pp. 6-9). Timing of a firing, taken alone, is not sufficient to create a genuine issue of material fact. *Withers v. Johnson*, 763 F.3d 998, 1005 (8th Cir. 2014). Generally, "more than a temporal connection is required to present a genuine factual issue on retaliation." *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 915 (8th Cir. 2006) (quotation omitted); *see also Carrington v. Des Moines*, 481 F.3d 1046, 1052 (8th Cir.

2007) ("An inference of a causal connection . . . can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue . . ."). Six months separate Plaintiff's paycheck complaints and her termination. "[A] gap in time between the protected activity and the adverse employment action 'weakens the inference of retaliation that arises when a retaliatory act occurs shortly after a complaint.'" *Grey*, 396 F.3d at 1035 (quoting *Calder v. TCI Cablevision of Mo., Inc.*, 298 F.3d 723, 731 (8th Cir. 2002)); *see also Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1149 (8th Cir. 2008) ("[W]e have held that an interval of two months is too long support [a causal] inference.").

Plaintiff attempts to supplement her temporally-based argument by challenging the circumstances surrounding her June 29th, 2014 accident, as well as the procedures employed by her supervisors and the joint arbitration committee when the parties ascertained whether Plaintiff should be terminated. (*See* Doc. 102, pp. 9-11).[3] Plaintiff cites *Barrentine v. Ark.-Best Freight Sys, Inc.*, 450 U.S. 728 (1981) to support the proposition that arbitration decisions under a collective bargaining agreement do not necessarily preclude employees from bringing claims pursuant to laws that guarantee minimum substantive employee protections, such as the FLSA. *See Barrentine*, 450 U.S. at 737. *Barrentine* would arguably control Plaintiff's case if Plaintiff received an adverse arbitration decision stemming from a FLSA-related grievance, and Defendants had attempted to use the decision to preclude a subsequent FLSA claim. However, Defendants instead advance the arbitration decision as both relevant to defeat Plaintiff's

---

[3] In this section, among other sections, Plaintiff also advances her continuing objections to various aspects of the discovery process. (*See* Doc. # 102, pp. 1-6, 9-12). Prior to this Order, the parties aired extensive discovery arguments and the Court determined to circumscribe the scope of discovery under the relevant Federal Rules of Civil Procedure. (*See* Doc. # 64, 72, 74, 77, 78, 86). To the extent Plaintiff, through the comments in her filings, requests additional discovery-related relief, Plaintiff's request is DENIED, as discovery is closed.

*McDonnell-Douglas's* burden of proving causation, and as evidence of a legitimate, non-retaliatory basis for Plaintiff's termination. (*See* Doc. # 103, p. 32-33).

JCT terminated Plaintiff because Plaintiff was involved in a workplace accident that resulted in bodily harm to another person. Taken alone, "the presence of intervening events undermines any causal inference that a reasonable person might otherwise have drawn from temporal proximity." *Freeman v. Ace Tel. Ass'n*, 467 F.3d 695, 698 (8th Cir. 2006). Plaintiff's accident itself is enough to defeat Plaintiff's attempt to prove a causal link between her paycheck complaints and her termination. Moreover, the decision was upheld by the Committee, pursuant to procedures in the CBA. (*See* Ditta Dep., 47:20-49:8). Thus, Plaintiff cannot establish the causation element of a prima facie case of retaliation under the FLSA.

Further, Defendants advance a legitimate, non-retaliatory basis for Plaintiff's termination. Beyond incorporating her earlier arguments that attempted to demonstrate causation, Plaintiff fails to demonstrate Defendants' advanced basis was merely pretextual. *See Grey*, 396 F.3d at 1035 (finding "evidence was not sufficient to create a genuine issue of material fact on the question whether the reasons articulated by [defendants] were a pretext for retaliation"); *see also Green*, 459 F.3d at 916-17 (analyzing plaintiff's argument, when plaintiff simply incorporated earlier-advanced evidence in attempt to establish pretext).

For the above-analyzed reasons, the Court finds that Plaintiff fails to establish causation and fails to overcome Defendants' legitimate, non-retaliatory basis for terminating her employment. Plaintiff cannot meet the requirements of *McDonnell-Douglas*. Therefore, Defendants' Motion for Summary Judgment on Claim I GRANTED.

### b. Wrongful Withholding of Wages

Plaintiff next claims that Defendants violated the FLSA when Plaintiff was issued her paycheck on a Friday instead of a Thursday twice during February 2014. (Doc. # 43, p. 7-8). Plaintiff does not claim she was unpaid or paid the incorrect amount. Plaintiff merely alleges her paycheck was not available on Thursday, so she had to pick her paycheck up on Friday. (Doc. # 95, pp. 4-6). Plaintiff claims she is entitled to damages in the amount of the entire sum of her two late paychecks, as well as liquidated damages. (*Id.* at 19-20).

The FLSA requires employers to pay their employees a minimum wage. 29 U.S.C. § 206. Additionally, "[a]ny employer who violates the provisions of [the FLSA] of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." *Id.* at § 216(b).

Plaintiff and Defendants disagree on whether pay day was on Thursday or Friday. (*See* Doc. # 95, pp. 16-18; Doc. # 101, pp. 19-24). The disagreement is immaterial. It is uncontroverted that the paychecks were dated for Friday of each workweek. (Christopher Dep., 271:21-272:15). Therefore, Plaintiff would not have access to the funds until Friday, regardless of whether she picked up her paper check on Thursday. Plaintiff cites the Department of Labor's FLSA interpretations to support her argument; "'wages' cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear.'" 29 C.F.R. § 531.35. However, Plaintiff would only have free and clear access to her paycheck, as contemplated by the Department of Labor, on Friday.

Additionally, Congress did not intend the FLSA to generate a windfall for an employee claiming the Act's protections. *See Integrity Staffing Solutions, Inc. v. Busk*, -- US --, 135 S. Ct.

513, 516-17 (2014) (discussing Congress's rejection of broad judicial interpretations of the FLSA); *see also Bell v. Iowa Turkey Growers Co-op*, 407 F. Supp. 2d 1051, 1061-62 (S.D. Iowa 2006); *Shepard v. Waterloo*, No. 14-CV-2057-LRR, 2015 WL 9165915, at *18 (N.D. Iowa Dec. 16, 2015). The FLSA sections Plaintiff cites contemplate damages for *unpaid* wages. *See* 29 U.S.C. § 216(b). Even if Plaintiff was paid late twice in February 2014, the FLSA offers no remedy for payments made one day late. *See Shepard*, 2015 WL at *24 ("To entirely disregard the fact that [plaintiff] has been paid; albeit *three years late* . . . would be to grant him a windfall and punish the employer for attempting to comply with its obligations."). Accordingly, the Court finds no genuine issue of material fact, and Defendants' Motion for Summary Judgment on Claim II is GRANTED. Plaintiff's Motion for Summary Judgment on Claim II is DENIED.

**B.      Title VII Claims**

**a.      Sex and Pregnancy Discrimination**

Plaintiff claims JCT discriminated against her on the basis of her pregnancy. (Doc. # 43, pp. 9-10). She claims JCT's bathroom policy, compared with her male counterparts, disparately impacted her as a pregnant woman. (*Id.*).

"Title VII makes it 'an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." *Lang v. Star Herald*, 107 F.3d 1308, 1311 (8th Cir. 1997) (ellipses in original) (quoting 42 U.S.C. § 2000e-2(a)). "The Pregnancy Discrimination Act makes clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy." *Young v. United Parcel Serv., Inc.*, -- U.S. --, 135 S. Ct. 1338, 1343 (2015); *see also Fjelsta v. Zogg Dermatology, PLC*, 488 F.3d 804, 809 (8th Cir. 2007). "[W]omen affected by pregnancy,

childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . ." *Young*, 135 S. Ct. at 1345 (ellipses in original) (quoting 42 U.S.C. § 2000e(k)).

To establish a prima facie case of disparate impact a plaintiff must identify "a specific employment practice and then present[] statistical evidence of a kind and degree sufficient to show that the practice in question caused the plaintiff to suffer adverse employment action because of his or her membership in a protected group." *Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 953 (8th Cir. 2001) (citing *Watson v. Fort Worth Bank and Tr.*, 487 U.S. 977 (1988)); *see also Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674, 681 (8th Cir. 1996). If a plaintiff successfully establishes the prima facie case, the burden shifts to the employer to demonstrate a legitimate business reason for the employment practice. *Evers*, 241 F.3d at 953 (citing *Watson*, 487 U.S. at 997-98). "If the employer successfully establishes a business justification, the plaintiff may still prevail by demonstrating that a comparably effective alternative practice would produce a significantly smaller adverse impact on the protected class." *Id.* at 953-54 (citing *Watson*, 487 U.S. at 998).

Disparate impact claims under Title VII are generally alleged within the context of facially neutral hiring, firing, promotion, or payment decisions that disproportionately affect one protected class of persons, compared with non-members of that class. *See*, *e.g.*, *Ricci v. DeStefano*, 557 U.S. 557, 563 (2009) (discussing disparate impact regarding promotion practices); *Bradley v. Pizzaco of Nebraska, Inc.*, 939 F.2d 610, 611-612 (8th Cir. 1991) (applying disparate impact analysis to firing decisions); *Slattery v. Douglas Cty. Neb.*, No. 8:10CV319, 2012 WL 893143, at *3 (D. Neb. March 15, 2012) (analyzing disparate payment on the basis of employee's gender). Cases that have dealt with inadequate facilities have focused on the

inadequacy or unavailability of one sex's restrooms, as compared with the other sex's facilities. *See Wedow v. Kansas City, Mo.*, 442 F.3d 661, 671-72 (8th Cir. 2006) (discussing whether female employees' lack of private, sanitary shower and restroom facilities was inadequate under Title VII as a matter of law); *Wilkes v. Nucor-Yamato Steel Co.*, No. 3:14-CV-00224-KGB, 2005 WL 5725771, at *12 (E.D. Ark. Sept. 29, 2015) (discussing whether total denial of female restroom facilities violated Title VII).[4]

In this circumstance, Plaintiff does not allege she suffered from the unavailability women's restrooms, nor does she claim her restrooms were inadequate compared to the men's restrooms. Plaintiff simply alleges that Defendants' restroom policy adversely affected her compared to her male counterparts. Her argument wavers between claiming the restroom-use policy was too restrictive because the policy required her to request a supervisor's permission before going to the restroom[5], and claiming that the restroom-use policy causes pregnant women a greater amount undue embarrassment than their non-pregnant, male counterparts. (Doc. # 43, p. 9; Doc. 102, p. 12). Plaintiff fails to establish a prima facie case that would shift the burden to Defendants to offer a business necessity for the restroom policy.

Plaintiff does not claim there was any difference between the men's and women's facilities–only that she was disparately impacted due to her need to use the restroom more frequently than her male counterparts. (Doc. # 43, p. 9-10). Plaintiff readily admits that Defendants offered restroom facilities at both the Wade Yard and City Yard. (Doc. # 95, pp. 22-

---

[4]While *Wedow* analyzes the restroom issue under disparate treatment analysis, the case offers persuasive guidance. *See* 42 U.S.C. § 2000e-2(k).

[5] The Court acknowledges Defendants claim the policy merely required notification before an employee used the restroom. (*See* Doc. 101, ¶ 30). The difference between Plaintiff's and Defendants' accounts is not critical to the outcome, and is consequently not a genuine dispute of material fact. *See Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271-72 (8th Cir. 1992).

23).[6]  The only times Defendant was required to communicate with her supervisor before using the restroom were when Defendant wished to cross the street to use the Wade Yard facilities. (Ditta Dep., 56:19-57:16).  Even taking Plaintiff's argument to the broadest extent, the mere existence of a restroom policy requiring employees to ask permission from a supervisor before using the restroom does not, itself, violate Title VII, even when members of a protected class need to use the restroom more so than non-members.  *See E.E.O.C. v. JBS USA, LLC*, No. 8:10-CV-318, 2013 WL 6621026, at *6-7, *19 (D. Neb. Oct. 11, 2013) (granting partial judgment on the findings for defendant employer that maintained policy requiring employees to request permission to use the restroom, despite affected Muslim employees more than non-Muslim employees).  Plaintiff directs the Court to no controlling authority[7] that indicates Title VII offers a remedy for pregnant women that allege disparate treatment, despite having equal access to private facilities of the same quality as their non-pregnant and male counterparts.  *See* (Doc. # 95, pp. 21-24; Doc. # 102, pp. 11-12; Doc. # 104, pp. 2-4).

Further, Title VII disparate impact claimants must provide statistical evidence to support their prima facie case.  *Evers*, 241 F.3d at 953 (citing *Watson*, 487 U.S. at 994).  Plaintiff, over the course of two suggestions filed after the parties cross-motioned for summary judgment, did

---

[6] Plaintiff points out the CBA required restrooms with running water and the only restrooms with running water were located at the Wade Yard.  (Doc. # 95, pp. 22-23).  This fact is not relevant, as this claim is brought under VII.  Title VII does not incorporate private contractual terms.  *See Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 75-76 (1998) (discussing the difference between asserting a contractual right under a collective bargaining agreement, and asserting an independent statutory right under Title VII).

[7] Plaintiff primarily relies on *DeClue v. Cent. Illinois Light Co.*, 223 F.3d 434 (7th Cir. 2000) to support her disparate impact claim.  (*See* Doc. # 95, p. 22; Doc. # 102, p. 12).  *DeClue* involved a female plaintiff suing under Title VII for an employer that provided no private restroom facilities for men or women.  *DeClue*, 223 F.3d at 436.  Women were simply expected to urinate in public alongside the male employees.  *Id.*  Further, the Court never analyzed the merits of the plaintiff's disparate impact claim, as she litigated the case as a sexual harassment action.  *Id.* at 437.  Therefore *DeClue* offers little persuasive value.

not offer statistical support for her claims.  (Doc. # 95, p. 22; Doc. # 102, p. 12).  She instead simply references common knowledge to support her disparate impact claim.  (*Id.*).  Only in her final Reply Suggestions does she cite to information beyond the scope of common knowledge. (Doc. # 104, pp. 3-4).  Plaintiff cites to a publicly available Occupational Safety and Health Administration opinion, an article from TIME Magazine, and a Harvard Medical School academic journal article.[8]  (Doc. # 104, pp. 2-4).  Only the Harvard Medical School article mentions statistics relevant to the guidance of *Watson* and its progeny.  *See Watson*, 487 U.S. at 994-95.  Plaintiff quotes the following passage of the Harvard article in her Reply Suggestions:

> [T]he question of what constitutes bathroom equity raises a central feminist issue: when does apparent equality constitute inequity because women's needs are different from those of men? . . . . [H]ere are many physical reasons why, on average, women use the toilet more frequently than men. About a quarter of adult women are menstruating at any given moment, which increases both their need for toilets and the time spent in a stall. Urinary tract infections are twice as common in women as in men, with about 20 percent of women experiencing infection at some point in their lives. Interstitial cystitis, a chronic inflammation of the bladder wall, which, like urinary tract infections, increases both urinary frequency and the sense of urgency, is far more common in women. Pregnancy also contributes to women's need for more bathrooms: in early pregnancy, hormonal changes increase the need to urinate, while in late pregnancy, the uterus presses on the bladder, reducing its capacity. Urinary tract infections are also more common during pregnancy, and vaginal delivery can damage the pelvic floor muscles, leading to lifelong bladder problems. Thirty percent of women between the ages of fifteen and sixty-four may suffer from some form of urinary incontinence, as opposed to between 1.5 and 5 percent of men.

(Doc. # 104, pp. 4-5).

---

[8] Judith Plaskow, *Embodiment, Elimination, and the Role of Toilets in Struggles for Social Justice*, Cross Currents, vol. 58, no. 1 (Spring 2008) (citing Julia Edwards and Linda McKie, *Women's Public Toilets: A Serious Issue for the Body Politic*, *in Embodied Practices: Feminist Perspectives on the Body*, ed., Kathy Davis (London, Thousand Oaks, CA, and New Delhi: SAGE Publications, 1997), pp. 136-38, Exhibit 2; *Better Bladder and Bowel Control, a Special Health Report from Harvard Medical School* (Cambridge, 2007), pp. 4-5, 6-7; and Stephanie Watson, *The Urinary System* (Westport, CT, and London: Greenwood Press, 2004), pp. 21-22, 120-21, 152, 170).

"[C]ourts . . . [are not] obliged to assume plaintiffs' statistical evidence is reliable." *Watson*, 487 U.S. at 996. "[D]eficiencies in facially plausible statistical evidence may emerge from the facts of particular cases." *Id.* at 997. Relevant statistical evidence demonstrates how members of a particular class were adversely affected *specifically* by the challenged employment practice. *See Krauel*, 95 F.3d at 681 (finding plaintiff offered insufficient statistical evidence); *see also Bennett v. Nucor Corp*, 656 F.3d 802, 817 (8th Cir. 2011) (stating plaintiff's expert failed to demonstrate connection between offered statistical evidence and employment practice responsible for alleged disparate impact); *Leach v. Prudential Signature Real Estate*, No. 04-0644-CV-W-DW, 2006 WL 42333, at *2 n.1 (W.D. Mo. Jan. 5, 2006) (stating "[plaintiff] presents no statistical evidence whatever of a disproportionately adverse impact of [defendant's] work hours and dress codes on pregnant women" (citations omitted)). Plaintiff's tendered evidence, despite advancing generalized statistics regarding women's restroom needs, fails to demonstrate the specific adverse impact Defendants' restroom policy imposes on pregnant women. Generalized assertions do not suffice to establish a prima facie case of disparate impact. *See id.* Defendants' Motion for Summary Judgment on Count III is GRANTED. Plaintiff's Motion for Partial Summary Judgment on Count III is DENIED.

### b. Discrimination on the Basis of Sex

Plaintiff's First Amended Complaint advances a claim that Defendants discriminated against Plaintiff on the basis of her sex. (Doc. # 43, pp. 10-11). Plaintiff's Suggestions in Opposition to Defendants' Motion for Summary Judgment indicates she does not dispute that she cannot succeed on the claim. (Doc. # 102, p. 13). Defendants' Motion for Summary Judgment on Count IV is GRANTED.

### c. Discrimination on the Basis of Race

Plaintiff's First Amended Complaint advances a claim that Defendants discriminated against Plaintiff on the basis of her race. (Doc. # 43, p. 11-12). Similar to Count IV, discussed above, Plaintiff no longer disputes that she cannot succeed on the claim. Defendants' Motion for Summary Judgment on Claim V is GRANTED.

## C.   Invasion of Privacy – Public Disclosure of Private Facts

Plaintiff last claims Defendants' restroom policy unreasonably invaded her privacy and forced her to publicly disclose private facts. (Doc. # 43, pp. 13-14). Plaintiff alleges that JCT requiring her to communicate with her supervisor over a radio channel open to her co-workers about needing to use the restroom constitutes a broadcast of private matters in which the public had no legitimate concern, and that would bring shame or humiliation to a person of ordinary sensibilities. (*Id.* at 13).

Plaintiffs claiming invasion of privacy by way of public disclosure of private facts must establish four elements: "(1) publication, (2) absent waiver or privilege, (3) of private matters in which the public had no legitimate concern, and (4) such as to bring shame or humiliation to a person of ordinary sensibilities." *Brown v. Mullarkey*, 532 S.W.2d 507, 509 (Mo. Ct. App. 1982) (citing *Corcoran v. Sw. Bell Tel. Co.*, 572 S.W.2d 212, 214 (Mo. Ct. App. 1978). "Admittedly it is difficult to define precisely the limits of what is and is not an actionable invasion of privacy, but some factual situations so clearly and unquestionably do not result in an invasion of privacy that the courts should so declare as a matter of law." *Langworthy v. Pulitzer Pub. Co.*, 368 S.W.2d 385, 390 (Mo. 1963). "[T]he right of privacy is not an absolute right, and it protects only the ordinary sensibilities of an individual and not supersensitivities." *Id.* (citing 77 C.J.S. Right of Privacy § 2).

The Missouri state courts routinely turn to the Restatement (Second) of Torts to assist their analysis of invasion of privacy – public disclosure of private fact claims. *See, e.g., Childs v. Williams*, 825 S.W.2d 4, 8 (Mo. Ct. App. 1992); *Y.G. v. Jewish Hosp. St. Louis*, 795 S.W.2d 488, 498 (Mo. Ct. App. 1990); *Buller v. Pulitzer Pub. Co.*, 684 S.W.2d 473, 480-481 (Mo. Ct. App. 1984); *Mason v. Williams Disc. Ctr.*, 639 S.W.2d 836, 838 (Mo. Ct. App. 1982).

> The rule stated in this Section applies only to publicity given to matters concerning the private, as distinguished from the public, life of the individual. There is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public.
>
> .       .       .
>
> Similarly, there is no liability for giving further publicity to what the plaintiff himself leaves open to the public eye. Thus he normally cannot complain when his photograph is taken while he is walking down the public street and is published in the defendant's newspaper. Nor is his privacy invaded when the defendant gives publicity to a business or activity in which the plaintiff is engaged in dealing with the public.

Restatement (Second) of Torts § 652D (2016).

Considering the above-quoted portion of the Restatement (Second) of Torts, the Court finds Plaintiff's claim fails as a matter of law. Plaintiff's claims do not established she has alleged a disclosure of a private matter in which the public has no legitimate concern, nor can she plausibly demonstrate the disclosed fact would bring shame or humiliation to a person of normal sensibilities. Plaintiff's bathroom habits would undoubtedly be open to observation from her co-workers, regardless of whether she broadcasted her habits on the radio.[9] Further, as Plaintiff's trips to the restroom affected the operations of JCT's shuttle vans, Plaintiff's co-workers and supervisors had a legitimate concern in knowing when she was leaving to take a restroom break. *See Wooten v. Pleasant Hope R-VI Sch. Dist.*, 139 F. Supp. 2d 835, 845 (W.D. Mo. 2000) (finding publicly disclosed matter within the public interest because the matter affected

---

[9] For instance, Plaintiff announced one trip to the restroom on social media, stating "[j]ust ran into my girls at work on a restroom run." (Christopher Dep., 200:18-203:17).

plaintiff's teammates and success of the organization).  Consequently, Defendants' Motion for Summary Judgment on Count VI is GRANTED.

**D.** **Motion for Summary Judgment Regarding Title VII Claims against Luc Stowers**

Defendants request summary judgment in their favor on Plaintiff's assertion of Title VII claims against Luc Stowers as an individual.  (Doc. # 93, p. 11-12).  Defendant argues that Title VII relief requires a plaintiff to exhaust administrative remedies prior to seeking relief from a court, and that Title VII precludes supervisors from liability under its protections.  (*Id.*).  Plaintiff does not oppose Defendants' arguments.  To the extent summary judgment was not granted regarding the claims analyzed above, Defendants' motion for summary judgment regarding Luc Stowers' Title VII liability is GRANTED.

## CONCLUSION

The Court finds that Defendants did not violate the FLSA regarding Plaintiff's wrongful discharge and wrongful withholding claims.  Further, Defendants' restroom policy did not violate Plaintiff's rights under Title VII; nor did Defendants' restroom policy result in a public disclosure of private facts that invaded Plaintiff's privacy.  Finally, Plaintiff failed to contest Defendants' request for summary judgment in Defendants' favor for the remaining sex and race discrimination claims. Accordingly, for the reasons and analysis outlined above, it is **ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED.**  Plaintiff's Motion for Summary Judgment is **DENIED**.[10]

**IT IS SO ORDERED.**

---

[10] Since filing this Motion for Summary Judgment, Plaintiff has filed three motions that are still outstanding.  (*See* Docs. ## 97, 106, 107).  All subsequent filings are accordingly moot, and the motions are denied.

s/ Gary A. Fenner

GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED: March 15, 2017